543 A.2d 1106

**COMMONWEALTH of Pennsylvania**

v.

**James J. TRILL, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 21, 1987.

Filed May 12, 1988.

Reargument Denied July 8, 1988.

Nicholas J. Caniglia, Wayne, for appellant.

Sandra L. Elias, Deputy District Attorney, Media, for Com., appellee.

Before CIRILLO, President Judge, and BECK and TAMILIA, JJ.

CIRILLO, President Judge:

This is an appeal from a judgment of sentence entered in the Court of Common Pleas of Delaware County following James J. Trill's conviction for robbery, simple assault, terroristic threats, and theft by receiving stolen property. We affirm.

The charges against Trill arose out of an incident that occurred at the Riddle Ale House, Middletown Township, Delaware County, on the evening of January 8, 1984. At approximately 7:30 p.m. Trill entered the restaurant and walked behind the bar counter. He then tapped the bartender, John Naughton, on the shoulder and requested a "take out" order of beer. Mr. Naughton informed Trill that Riddle Ale House did not provide take out service for its customers, and he further explained that restaurant policy prohibited patrons from being behind the bar counter. Consequently, Mr. Naughton asked Trill to return to the area in

front of the bar. Trill ignored this request and opened his overcoat to display what appeared to be a rifle. He then stated: "[T]his is a sawed-off shotgun, open that [cash register] drawer and give me the money or I'll blow your f_____ brains out." Mr. Naughton indicated that he could not open the cash register drawer without the manager's assistance. Thwarted in his attempt to obtain the cash from Naughton, Trill began to search the dining room area of the restaurant, hoping to locate the manager. While Trill was gone, Naughton found his manager in the back room of the building, and told him to summon the police.

Trill exited the building without obtaining any cash and was immediately observed by State Police Trooper Joseph Karlin, who had arrived at the scene in less than thirty seconds after receiving the call. Trill was standing in the restaurant parking lot, beside a station wagon. Upon noticing the arrival of the police, Mr. Naughton vaulted out into the parking lot and struck Trill, exclaiming "That's the guy!" The police officers apprehended and arrested Trill and confiscated a toy rifle that he had allegedly represented as authentic during the attempted robbery. The rifle was clearly visible to the officers through the open door of the automobile where Trill was standing. A search of Trill incident to his arrest disclosed the presence of a gold watch, a man's wedding band, a gold cigarette lighter with the inscription "Don," and medication with the name Donald Pritchett on the label. Police later discovered that these items had been stolen from Donald Pritchett's car earlier in the day. Trill was then taken into custody and detained pending trial.

A jury trial was held in the Court of Common Pleas of Delaware County before the Honorable Anthony R. Semeraro. Although Trill interposed a defense of insanity, the jury found him guilty but mentally ill on the charges of robbery, 18 Pa.C.S. § 3701, simple assault, *id.* § 2701, and terroristic threats, *id.* § 2706. He was found guilty of the charge of theft by receiving stolen property, *id.* § 3925. The trial court denied post-trial motions. This appeal followed.

Trill advances the following seven issues for our review: (1) whether the charges against him should have been dismissed by the trial court pursuant to Rule 1100 of the Pennsylvania Rules of Criminal Procedure; (2) whether Trill's conviction of theft by receiving stolen property must be vacated since it is inconsistent with the verdict of guilty but mentally ill; (3) whether the evidence was sufficient to sustain the finding that Trill was not insane; (4) whether the trial court denied Trill a fair and impartial jury trial by failing to grant his requested questions for voir dire; (5) whether the trial court improperly permitted the admission of hearsay testimony regarding the physician's report of his sanity; (6) whether the trial court improperly instructed the jury on the charge of legal insanity; and (7) whether Pennsylvania's guilty but mentally ill statutory scheme, 18 Pa.C.S. § 314, violates Trill's constitutionally protected equal protection and due process rights.

Trill initially contends that the trial court should have dismissed the charges lodged against him because of the Commonwealth's alleged failure to comply with Rule 1100 of Pennsylvania's Rules of Criminal Procedure. Rule 1100 provides, in pertinent part:

(a)(2) Trial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed.

\* \* \* \* \* \*

(c)(1) At any time prior to the expiration of the period for commencement of trial, the attorney for the Commonwealth may apply to the court for an order extending the time for commencement of trial.

\* \* \* \* \* \*

(2) A copy of such motion shall be served upon the defendant through his attorney, if any, and the defendant shall also have the right to be heard thereon.

Pa.R.Crim.P. 1100(a)(2), (c)(1), (2).

Rule 1100 "serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2)

the protection of society." *Commonwealth v. Brockle-hurst*, 491 Pa. 151, 153–154, 420 A.2d 385, 387 (1980); *Commonwealth v. Simms*, 509 Pa. 11, 500 A.2d 801 (1985). Bearing this in mind, our supreme court has offered the following standard for reviewing Rule 1100 claims:

> So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 1100 must be construed in a manner consistent with society's right to punish and deter crime.... [C]ourts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well. Strained and illogical judicial construction adds nothing to our search for justice, but only serves to expand the already bloated arsenal of the unscrupulous criminal determined to manipulate the system.

*Commonwealth v. Genovese*, 493 Pa. 65, 72, 425 A.2d 367, 370–71 (1981). Further, "[t]he administrative mandate of Rule 1100 certainly was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth." 493 Pa. at 70, 425 A.2d at 370. It is with these precepts in mind that we consider Trill's Rule 1100 claim.

The first criminal complaint against Trill, Information 127–84, was filed on January 9, 1984; the second complaint, Information 541–84, was filed on January 19, 1984. Therefore, pursuant to Rule 1100, the trials should have commenced on or before July 10 and July 19, 1984, respectively. Any delay beyond the 180–day speedy trial period must be either excluded from the computation of the period under Rule 1100(d), or justified by an order granting an extension pursuant to Rule 1100(c). *Commonwealth v. Snyder*, 280 Pa.Super. 127, 421 A.2d 438 (1980).

Rule 1100 excludes from the computation of the 180–day time frame any period of delay that results from "the unavailability of the defendant or his attorney." Pa.R. Crim.P. 1100(d)(3)(i). In the case at bar, the Commonwealth

is entitled to several exclusions because of Trill's unavailability for trial. Trill requested a continuance of the preliminary hearing to allow the appointment of conflict counsel from January 17 to February 7, 1984, a period of time encompassing twenty-one days. This excludable time was not contingent upon Trill's express waiver. See Pa.R. Crim.P. 1100(d)(3)(ii). Consequently, we exclude this twenty-one days in our Rule 1100 computation. Additionally, Trill was granted a continuance for psychiatric evaluation from April 30 to May 14, 1984. The Commonwealth is also entitled to the exclusion of these fifteen days, bringing the total amount of excludable days as a result of Trill's unavailability at this early stage to thirty-six days.

Under Rule 1100, the Commonwealth is entitled to apply to the trial court for an order extending the time for commencement of the trial. Pa.R.Crim.P. 1100(c)(1). On June 25, 1984, the Commonwealth properly filed a Rule 1100 extension petition which resulted in the grant of an extension on both informations for ninety days from the date that Trill was declared competent to stand trial. The order stated: "the time for commencement of trial is extended for a period of ninety (90) days after the date when Defendant is declared competent to stand trial by the appropriate medical authorities at Haverford State Hospital." In light of the extension, our inquiry turns to a determination of whether Judge Surrick's extension order was properly followed.

■ Trill claims that he was declared competent to stand trial by the authorities at Haverford State Hospital on September 25, 1984; however we note that on that same day Trill "walked off" the grounds at Haverford State Hospital and was arrested on new robbery, stolen car, and resisting arrest charges. After his arrest and recapture, the trial court reassessed Trill's competence to stand trial. The result of the inquiry was an order, dated November 23, 1984, adjudicating Trill incompetent to stand trial. Thus, even if we were to consider September 25, 1984 as the threshold date for the commencement of the ninety-day

period, the trial court's November 23, 1984 order declaring Trill incompetent to stand trial vitiated the effect of Judge Surrick's order. Two months later, on January 28, 1985, the court entered another order declaring that Trill remained incompetent to stand trial. As a result, the Commonwealth petitioned for another Rule 1100 extension, which the trial court granted on February 1, 1985. Time for trial was extended to "no later than 90 days from the date upon which the defendant is found by the court to be competent to stand trial."

It was not until August 15, 1985 that the trial court declared Trill competent to stand trial. Since the delay from November 23, 1984 to August 15, 1985 was attributable to Trill by reason of his incompetency, this period is excludable from our Rule 1100 computations. *Commonwealth v. Armstead*, 359 Pa.Super. 88, 518 A.2d 579 (1986). After the August 15, 1985 finding of competency, the Commonwealth had until November 13, 1985 to bring Trill to trial. For Rule 1100 purposes, the trial commenced on November 12, 1985, when Judge Semeraro heard motions which had been reserved for the time of trial. *See Jones v. Commonwealth*, 495 Pa. 490, 434 A.2d 1197 (1981); *Commonwealth v. Bond*, 350 Pa.Super. 341, 504 A.2d 869 (1986). Having determined that Trill's trial commenced before November 13, 1985, we conclude that the Commonwealth properly brought him to trial within the time limitations imposed by Rule 1100. Accordingly, we dismiss his Rule 1100 claim as meritless.

Trill next contends that the jury's guilty verdict on the charge of theft by receiving stolen property must be vacated because of its inconsistency with the verdict of guilty but mentally ill on the remaining charges. Since the offenses in both informations occurred on the same day, Trill proclaims that it logically follows that he should have been found guilty but mentally ill on the theft charge also. We disagree.

■ It is now axiomatic that consistency in criminal verdicts is not required. In addressing an appeal involving allegedly inconsistent verdicts, our supreme court has stated:

[E]ven if it were assumed that the two verdicts were logically inconsistent, such inconsistency alone could not be grounds for a new trial or for reversal. "It has long been the rule in Pennsylvania and in the federal courts that consistency in a verdict in a criminal case in not necessary."

*Commonwealth v. Gravely*, 486 Pa. 194, 205, 404 A.2d 1296, 1301 (1979) (plurality opinion) (citations omitted); *see also Commonwealth v. Maute*, 336 Pa.Super. 394, 485 A.2d 1138 (1984). Inconsistent verdicts are proper so long as the evidence is sufficient to support the convictions that the jury has returned. *Commonwealth v. Graves*, 310 Pa.Super. 184, 456 A.2d 561 (1983).

■ The Commonwealth's evidence surrounding the theft by receiving stolen property charge was completely dissimilar from the evidence involved in the charges stemming from the incident at the Riddle Ale House. The theft by receiving stolen property charge was based primarily upon circumstantial evidence. When Trill was arrested, he possessed several items that belonged to Donald Pritchett. Pritchett had these items stolen from him earlier in the day, and had never known Trill or given him permission to seize the items. From the evidence adduced at trial, the finders of fact were unwilling to conclude that these facts established beyond a reasonable doubt that Trill was mentally ill at the time of the commission of the theft. The jurors were, however, willing to conclude that the evidence established beyond a reasonable doubt that Trill had committed the crime of theft by receiving stolen property. Consequently, the jury rendered a guilty verdict. We will not disturb this finding. It is well settled that a jury is free to believe all, some, or none of the evidence proffered at trial. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). Accordingly, we reject Trill's assertion that the

theft by receiving stolen property conviction must be vacated as being inconsistent with the finding of guilty but mentally ill.

Trill next asserts that the evidence was insufficient as a matter of law to sustain the finding that he was not insane at the time of the commission of his charged crimes. He maintains that the expert testimony introduced by both the prosecution and the defense strongly supports an insanity finding. Consequently, he alleges that such testimony should have been sufficient to convince a rational trier of fact that he was in fact insane.

The test for reviewing a sufficiency of the evidence claim on appeal from a conviction is:

> whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt.... The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.... Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered.... Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Griscavage*, 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986) (citation omitted).

■ Trill asks us to examine the testimony of Perry Berman, M.D., who testified on behalf of Trill, and compare it with that of Kenneth A. Kool, M.D., who testified for the prosecution. He claims that such an examination will yield an indisputable finding of insanity. We have examined all of the evidence involving Trill's mental state in the light most favorable to the Commonwealth. Drawing all reasonable inferences from that evidence, we have concluded that it was sufficient as a matter of law to sustain the finding of sanity. While it is true that the psychiatric testimony

concerning Trill's emotional status was conflicting, it was nonetheless within the jury's province to determine which account was more credible. In similar cases, we have stated:

> [W]hile psychiatric testimony is of probative value, it is within the province of the jury to determine the credibility and weight of such evidence.... Indeed, evidence on a defendant's mental condition can just as credibly come from the testimony of lay witnesses concerning the defendant's actions, conversations and statements at the time of the [crime] from which the jury could find that he knew what he was doing when he [committed the crime] and knew it was wrong.

*Commonwealth v. Ruth*, 309 Pa.Super. 458, 462, 455 A.2d 700, 702 (1983). In the instant case, several lay persons testified in conjunction with the psychiatric testimony. Mr. Naughton, Mr. Duke, State Police Troopers Kalin and Brown, and defense witness Mr. Sebold all testified in regard to Trill's apparent mental orientation. From that evidence it was reasonable for the fact finder to conclude beyond a reasonable doubt that Trill knew the nature and quality of his actions, or that he knew what he was doing was wrong. Having found that the evidence was sufficient to sustain the finding that Trill was legally sane at the time of the commission of the acts in the Riddle Ale House, we dismiss his allegation of error as meritless.

Trill's next claim of alleged trial error involves the propriety of Judge Semeraro's denial of his requested questions for voir dire. Trill avers that he was effectively denied a fair and impartial trial by not having been allowed to question prospective jurors about their personal feelings and inclinations regarding various aspects of the insanity defense.

In *Commonwealth v. Merrick*, 338 Pa.Super. 495, 488 A.2d 1 (1985), we reviewed the standard that our appellate courts utilize when addressing voir dire issues:

> We start our analysis with the general principle that the purpose of the voir dire system is to ensure the impanell-

ing of a fair, competent, impartial, and unprejudiced jury. To this end, the scope of a voir dire examination is within the sound discretion of the trial court; absent palpable error, we will not disturb a court's decision. Questions on voir dire should be tailored so as to "disclose lack of qualification and whether the juror has formed a fixed opinion as to the accused's guilt or innocence." However, questions which are "designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case" should not be permitted.

338 Pa.Super. at 500–01, 488 A.2d at 3 (citations omitted). It is now settled law in Pennsylvania that a trial court's refusal to permit the accused to question prospective jurors on voir dire about the juror's views of the insanity defense or their potential prejudice against the defense will not constitute palpable error warranting a reversal. *Commonwealth v. Biebighauser,* 450 Pa. 336, 300 A.2d 70 (1973); *Commonwealth v. Hathaway,* 347 Pa.Super. 134, 500 A.2d 443 (1985). Applying this well established case law, we find that Judge Semeraro committed no palpable error in refusing to allow Trill to question the Delaware County jury panel regarding their opinions of the insanity defense or possible prejudice against its use. Such questions would have gone beyond the permissible scope and purposes of voir dire. Further, aside from the above-cited authorities which conclusively refute Trill's claim of error, we note that the trial court did make the following query:

Ladies and gentlemen, is there any member of this panel who has such a fixed opinion about the defense of legal insanity at the time an offense is committed that he or she, if selected, could not hear all the evidence with an open mind and deliberate to a fair and honest verdict? If so, please signify by raising your hand. Let the record show there are none.

We believe that this line of questioning adequately and properly allayed the possibility of jury prejudice and partial-

ity that Trill asserts on appeal. Consequently, we dismiss this claim.

Trill also contends that the trial court improperly permitted the admission of various portions of his discharge summary from Haverford State Hospital during the cross-examination of defense psychiatrist Dr. Perry Berman. Since neither the custodian who prepared the report nor a representative of Haverford State Hospital testified at trial, Trill asserts that the document was impermissible hearsay evidence and constitutes reversible error. We cannot agree.

■ Underlying the hearsay rule is the tenet of law that an out-of-court statement offered for a purpose apart from the truth of its contents, or to explain a course of conduct, is not hearsay. *Commonwealth v. Belmonte*, 349 Pa.Super. 1, 502 A.2d 1241 (1985). Dr. Berman's testimony indicated that he had relied on a "set of discharge summaries" in forming his professional opinion. On cross-examination, the Commonwealth's attorney sought to clarify this statement and ascertain the grounds upon which Dr. Berman had based his evaluation. Under our supreme court's holding in *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971), a medical witness is permitted to express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but upon which the expert relied. Here, the trial court reasonably concluded, from the somewhat conflicting testimony of Dr. Berman, that he had relied on the discharge summary in formulating his opinion. Consequently, we believe that the testimony admitted into evidence in no way violated those protections springing from the hearsay rule.

Trill next claims that the trial court misread the jury instructions regarding legal insanity and thereby generated confusion and disruption for the orderly deliberation of Trill's verdict. Specifically, Trill directs our attention toward three incidents wherein Judge Semeraro allegedly misstated the law. First, Trill objects to the insanity charge which stated:

[A] person is legally insane if at the time of committing an alleged crime, he is laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he is doing, or if he does *not* know the nature and quality of the act, he does not know that what he is doing is wrong [emphasis added].

Trill complains that the word "not" should have been omitted in accordance with 18 Pa.C.S. § 315(b), and the Pennsylvania Suggested Standard Jury Instructions. The second allegation of error surrounds the allegedly improper reading of the following instruction: "I will tell you, however, that when a defendant is found *guilty* by reason of legal insanity, he may be subject to an immediate court proceeding to decide whether he should be committed to a mental treatment facility [emphasis added]." Trill asserts that the instruction should have read "*not* guilty by reason of legal insanity." Last, Trill complains that the following instruction was also improper: "I will tell you, however, that when a defendant is found not guilty by reason of insanity, he *may* be subject to an immediate court proceeding to decide whether he chould [sic] be committed to a mental treatment facility [emphasis added]." Trill insists that the case of *Commonwealth v. Mulgrew*, 475 Pa. 271, 380 A.2d 349 (1977), mandates that the court recite that "[the defendant] *will* be subject to an immediate court proceeding."

The scope of appellate review of a jury charge for reversible and prejudicial error requires that the charge be evaluated and considered as a whole. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987); *Commonwealth v. Sweger*, 351 Pa.Super. 188, 505 A.2d 331 (1986). The general effect of the jury charge controls because error will not be predicated upon isolated excerpts from the charge. *Commonwealth v. Stanton*, 316 Pa.Super. 397, 463 A.2d 19 (1983). Further, a trial court's deviation from the express language of the statutory instruction or a technical inaccuracy in the jury instruction which nevertheless adequately, accurately, and clearly expresses the law to the jury will not mandate reversal. *Commonwealth v. Frey*, 504 Pa. 428,

475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1985); *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986).

■■■■■ We agree with Trill that the trial court did in fact misstate the charge by inserting the word "not" in the first instance, and omitting it in the second. However, reading the charge as a whole, and considering that the trial court repeated the instructions correctly to the jury numerous times throughout the charge, we find no prejudicial error. Judge Semeraro's charge encompasses more than thirty-one transcribed pages of colloquy, involving lengthy discussions of complex areas of the law. It would be fatuous to require a trial judge to perform such a lengthy charge flawlessly on each attempt.

■■■■ We also find Trill's distinction between "may" and "will" in the third allegation of error to be specious. Here, Judge Semeraro read the insanity instruction as it appears in the Pennsylvania Suggested Standard Jury Instructions on the Insanity Defense. *See Pennsylvania Suggested Standard Jury Instructions—Criminal* § 5.01A (Revised Instruction Subcommittee Draft, Feb. 2, 1978). The instruction advocated by our supreme court in *Mulgrew,* which Trill cites as controlling, has been incorporated into the Pennsylvania Suggested Standard Jury Instructions. *Commonwealth v. Belmonte,* 349 Pa.Super. 1, 502 A.2d 1241 (1986). Accordingly, we cannot agree that this instruction was so erroneous as to constitute reversible or prejudicial error.

Trill's final claim of error surrounding the jury charge involves the assertion that the instruction of guilty but mentally ill is not mandatory, and may be waived by the defendant. He avows that by providing the jurors with the option to choose the guilty but mentally ill verdict without his consent, the court has effectively undercut his ability to present a successful insanity defense.

■■■■ A common-sense reading of the Pennsylvania statutory scheme belies this allegation. Section 314 provides

that when a person offers a defense of insanity, *he may be found guilty but mentally ill* if the trier of fact finds beyond a reasonable doubt that the person is guilty of an offense, was mentally ill at the time of the commission of the offense, and was not legally insane at the time of the commission of the offense. 18 Pa.C.S. § 314(a) (emphasis added). From the plain language of the statute, it logically follows that the jury *must* be charged on the guilty but mentally ill verdict whenever the insanity defense is set forth. One could not be found guilty but mentally ill, as the legislature has directed, if such a verdict is not made known to the jury panel. Bolstering this supposition are the comments of Dickinson School of Law professor Arthur Murphy, reporter to the Criminal Instructions Subcommittee of the Pennsylvania Supreme Court's Committee for Proposed Standard Jury Instructions. Professor Murphy advocates the use of the following instruction:

> Because the defendant has asserted an insanity defense, *you will have to consider four possible verdicts.* In addition to "guilty" and "not guilty" which are available verdicts in a criminal case, you will have to think about the special alternatives of "not guilty by reason of insanity" and of "guilty but mentally ill."

Murphy, *Legally Insane or Guilty but Mentally Ill: A Suggested Jury Instruction*, 88 Dick.L.Rev. 344, 347 (1984) (emphasis added). This instruction was approved by the Subcommittee and will eventually be added to the Committee's manual of suggested criminal charges. In light of the foregoing, we find that the trial court properly charged the jury on the verdict of guilty but mentally ill.

Trill's last issue controverts the viability of Pennsylvania's guilty but mentally ill statute, 18 Pa.C.S. § 314. Trill mounts an impelling challenge to the statutory scheme implemented by our legislature; however, we conclude that his laudable effort has fallen short of its goal. The overwhelming authority generated by our sister states, many of which have been grappling with this exact issue in their appellate courts for more than a decade, coupled with our

own analysis, dissuades us from invalidating a statutory scheme which we conclusively deduce passes constitutional muster.

Section 314 of our Crimes Code provides as follows:

(a) General rule.—A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

(b) Plea of guilty but mentally ill.—A person who waives his right to trial may plead guilty but mentally ill. No plea of guilty but mentally ill may be accepted by the trial judge until he has examined all reports prepared pursuant to the Rules of Criminal Procedure, has held a hearing on the sole issue of the defendant's mental illness at which either party may present evidence and is satisfied that the defendant was mentally ill at the time of the offense to which the plea is entered. If the trial judge refuses to accept a plea of guilty but mentally ill, the defendant shall be permitted to withdraw his plea. A defendant whose plea is not accepted by the court shall be entitled to a jury trial, except that if a defendant subsequently waives his right to a jury trial, the judge who presided at the hearing on mental illness shall not preside at the trial.

(c) Definitions.—For the purposes of this section and 42 Pa.C.S. § 9727 (relating to disposition of persons found guilty but mentally ill):

(1) "Mentally ill." One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

(2) "Legal insanity." At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or,

if he did know it, that he did not know he was doing what was wrong.

(d) Common Law M'Naghten's Rule preserved.—Nothing in this section shall be deemed to repeal or otherwise abrogate the common law defense of insanity (M'Naghten's Rule) in effect in this Commonwealth on the effective date of this section.

18 Pa.C.S. § 314. Analyzing this legislative enactment in light of well-settled constitutional principles, we must consider several basic tenets of statutory construction. A recognized maxim in Pennsylvania dictates that a strong presumption of constitutionality attaches to acts of the General Assembly, and a heavy burden of persuasion falls on any party seeking to rebut that presumption. *Consumer Party v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986); 1 Pa.C.S. § 1922(3); *id.* § 1921(a).

 Reiterating this aphorism of the law, our supreme court has stated:

The strong presumption of constitutionality enjoyed by acts of the General Assembly and the heavy burden of persuasion on the party challenging an act have been so often stated as to now be axiomatic. Legislation will not be invalidated unless it clearly, palpably, and plainly violates the Constitution, and any doubts are to be resolved in favor of a finding of constitutionality.

*Pennsylvania Liquor Control Board v. The Spa Athletic Club*, 506 Pa. 364, 370, 485 A.2d 732, 735 (1984). A reviewing court is obliged to exercise every reasonable attempt to vindicate the constitutionality of a statute and uphold its provisions. *Tracey v. Chester County Tax Claim Bureau*, 507 Pa. 288, 489 A.2d 1334 (1985); *James v. Southeastern Pa. Trans. Auth.*, 505 Pa. 137, 477 A.2d 1302 (1984). It is with these precepts in mind that we must evaluate Trill's challenges to section 314.

Trill's objection to the constitutionality of section 314 presents an unprecedented legal argument in our Pennsylvania appellate courts. Since we have not previously adjudicated the issues that appellant espouses before us today,

we consider it elucidating to undertake a cursory review of the growth and implementation of the guilty but mentally ill verdict and its intended purposes.

The guilty but mentally ill verdict was first interposed into American jurisprudence by the Michigan legislature in early 1975. *See* Mich.Comp.Laws Ann. §§ 768.36, 768.29, 330.2050(1) (West Supp.1986); *see also* Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded In Its Own Right and Successfully Preserved The Traditional Role Of The Insanity Defense,* 55 U.Cin.L.Rev. 943, 987 (1987). This legislation propagated as a result of public outcry over the Michigan Supreme Court's holding in *People v. McQuillan,* 392 Mich. 511, 221 N.W.2d 569 (1974). In *McQuillan* the court had struck down Michigan's automatic commitment statutes applicable to insanity acquittees in order to bring the proceeding within civil commitment standards. A concomitant result of this ruling was the release of numerous mentally ill patients from treatment facilities into the community. Several of these individuals subsequently perpetrated highly publicized, reprehensible crimes. *See* Comment, *Guilty But Mentally Ill: An Historical and Constitutional Analysis,* 53 J. Urban L. 471, 482–83 (1976); Robey, *Guilty But Mentally Ill,* 6 Bull.Am.A. Psychiatry 374, 374–75 (1979). Less than a year later, the Michigan lawmakers became pioneers in fashioning a statutory scheme designed to avert the scenario described above.

The Michigan law-making body pursued several important goals in adopting the verdict of guilty but mentally ill. As a matter of policy, the lawmakers sought to dissuade criminal defense attorneys from attempting to overutilize the insanity defense. Legislative research indicated that the use and exploitation of the insanity defense had resulted in outcomes inconsistent with its intended purposes. Consequently, the Michigan parliamentarians sought to provide jurors with an alternative or middle-ground verdict to the traditional "guilty," "not guilty," and "not guilty by reason of insanity." In so doing, they hoped to thereby reduce the

incidence of insanity acquittals, which had reached alarming proportions.

Additionally, the legislative body envisioned the new verdict as one which would protect society by incarcerating mentally disturbed, dangerous accusees who might otherwise be found not guilty by reason of insanity and subsequently released into the community. In conjunction with internment, the Michigan lawmakers aspired to implement a systematic program of psychiatric evaluation and treatment. Through this program it was hoped that the detainees would receive the therapy which they required concurrent with serving their mandated sentence. *See* Mickenberg, *supra*, at 988.

At first, law-making bodies throughout the country were reluctant to follow Michigan's novel statutory scheme. Most states emphatically maintained a "wait and see" attitude, hoping that Michigan's experiment would provide guidance for the implementation of their own guilty but mentally ill statutes. Between 1975 and 1982, only Indiana joined Michigan in putting into effect guilty but mentally ill legislation. *See* Ind.Code Ann. §§ 35–36–1–1 to 35–36–2–5 (Burns 1985 & Supp.1986). Indiana's legislation, like Michigan's, was spawned largely in response to a highly publicized violent crime wherein the defendant utilized the insanity defense, was adjudged not guilty by reason of insanity, and was subsequently released into the community. *See State v. Judy*, 275 Ind. 145, 416 N.E.2d 95 (1981). It was not until the 1982 acquittal of John W. Hinckley, Jr. for the March 30, 1981 assassination attempt of President Ronald Reagan that state lawmakers began to rapidly adopt guilty but mentally ill statutes for their respective states. *See United States v. Hinckley*, 672 F.2d 115 (D.C.Cir.1982); *see also* Kennelly & Dull, *Guilty But Mentally Ill: A New Verdict for South Dakota*, 30 S.D.L.Rev. 515, 515 (1985). Responding to the public disdain for the alleged inequity of permitting "responsible" defendants to escape punishment for their crimes, or treatment for their disease, states' assemblies hurried to enact provisions permitting the ver-

dict of guilty but mentally ill. Through the implementation of this verdict, jurors could effectively condemn a mentally ill defendant to incarceration for his or her deviant criminal actions while recognizing that those actions were the product of a mental aberration or illness requiring ongoing psychological therapy and treatment. *See* McGraw, Farthing–Capowich, Kailitz, *The Guilty But Mentally Ill Plea and Verdict: Current State of the Knowledge,* 30 Vill.L. Rev. 117, 125 (1985).

Since *Hinckley,* nine other states have joined Michigan and Indiana in adopting guilty but mentally ill statutes, modelled in large part after Michigan's statutory scheme. *See* Alaska Stat. §§ 12.47.020(c), 12.47.030, 12.47.050 (Supp. 1982); Del.Code Ann. tit. 11, § 401(b) (1979 & Supp.1982); Ga.Code Ann. § 17–7–131 (1981 & Supp.1986); Ill.Ann.Stat. ch. 38 paras. 6–2 to 6–4, 115–2 (Smith–Hurd Supp.1986); Ky.Rev.Stat.Ann. §§ 504.060(5), 504.120, 504.130 (Michie/Bobbs–Merrill 1985 & Supp.1986); N.M.Stat.Ann. §§ 31–9–3, 31–9–4, (1984); 18 Pa.Cons.Stat.Ann. § 314 (Purdon 1983); S.D.Codified Laws Ann. §§ 22–1–2(22), 23A–26–3, –23, –14 (1979 & Supp.1986); Utah Code Ann. §§ 77–13–1, 77–35–11, 77–35–21, 77–35–21.5 (1982 & Supp.1986). Maryland has instituted the guilty but mentally ill verdict through judicial decision. *See Pouncey v. State,* 297 Md. 264, 465 A.2d 475 (1983); *see also* Mickenberg, *supra,* at 950 n. 31 and accompanying text.

The assimilation of the guilty but mentally ill verdict into American jurisprudence has promulgated a host of constitutional challenges to its conceptual basis. Specifically, defense attorneys have mounted challenges to its viability predicated upon state and federal constitutional precepts of due process, *see Caldwell v. State,* 257 Ga. 10, 354 S.E.2d 124 (1987); *People v. Fierer,* 151 Ill.App.3d 649, 503 N.E.2d 594 (1987); *People v. Furman,* 158 Mich.App. 302, 404 N.W.2d 246 (1987); *People v. Ramsey,* 422 Mich. 500, 375 N.W.2d 297 (1985); *People v. DeWit,* 123 Ill.App.3d 723, 463 N.E.2d 742 (1984); *People v. Kaeding,* 98 Ill.2d 237, 456 N.E.2d 11 (1983); equal protection, *see People v. Carter,*

135 Ill.App.3d 403, 90 Ill.Dec. 212, 481 N.E.2d 1012 (1985); *Taylor v. State,* 440 N.E.2d 1109 (Ind.1982); *People v. Sorna,* 88 Mich.App. 351, 276 N.W.2d 892 (1979); *People v. Darwall,* 82 Mich.App. 652, 267 N.W.2d 472 (1978); *People v. Sharif,* 87 Mich.App. 196, 274 N.W.2d 17 (1978); the restraint on cruel and unusual punishment, *see People v. McLeod,* 407 Mich. 632, 288 N.W.2d 909 (1980); and, the prohibition on ex post facto laws, *see Kirkland v. State,* 166 Ga.App. 478, 304 S.E.2d 561 (1983); *People v. Marshall,* 114 Ill.App.3d 217, 448 N.E.2d 969 (1983). Regardless of vigorous attempts by advocates to dislodge the verdict, the highest courts in Georgia, Illinois, Indiana, and Michigan have all undeniably upheld the constitutionality of their respective guilty but mentally ill statutes. *See Worthy v. State,* 253 Ga. 661, 324 S.E.2d 431 (1985) (upholding Georgia's guilty but mentally ill statute, Ga.Code Ann. § 17-7-131, under due process and equal protection claims); *People v. Kaeding,* 98 Ill.2d 237, 456 N.E.2d 11 (1983) (upholding Illinois's guilty but mentally ill legislation, Ill.Ann.Stat. ch. 38 paras. 6-2 to 6-4, under an equal protection attack); *Taylor v. State,* 440 N.E.2d 1109 (Ind.1982) (upholding Indiana's guilty but mentally ill verdict, Ind.Code Ann. §§ 35-36-1-1 to 35-36-2-5, under an equal protection challenge); *People v. McLeod,* 407 Mich. 632, 288 N.W.2d 909 (1980) (upholding Michigan's guilty but mentally ill statutory scheme, Mich.Comp.Laws Ann. §§ 768.36, 768.29, 330.-2050(1), under due process, equal protection, and cruel and unusual punishment challenges). Our research indicates that none of the appellate courts in the twelve states that utilize the guilty but mentally ill verdict have struck down guilty but mentally ill legislation as unconstitutional.

Pennsylvania's guilty but mentally ill legislation was signed into law by Governor Dick Thornburgh on December 15, 1982. *See Legislative History of Senate Bills,* General Index, S.B. 171 at A-23 (1982); *see also* Angel, *"Guilty But Mentally Ill Debuts,"* 6 Pa.L.J.-Rep. 1, 10 (March 14, 1983). A review of the available legislative history of Senate Bill 171 provides scanty insight into the legislative purpose in enacting the verdict. Ironically, the primary debate sur-

rounding the bill did not deal with the substantive aspects of the act. Instead, the legislators hotly debated funding for the act, wrangling with the issue of whether the Commonwealth, or the counties, should bear the burden of the treatment of those offenders found guilty but mentally ill. *See* Pa.Legislative Journal, House, 1627–45 (Sept. 21, 1982). There was, however, some discussion of the substantive implications of the bill. One of these discussions, initiated by Representative Levin of Philadelphia County, surrounded the definitions of "insanity" and "guilty but mentally ill" under the proposed bill. Representative Levin stated as follows:

> [T]he definition of "insanity" and the definition of "guilty but mentally ill" are in fact the same.... [U]nder the two definitions, could anyone who is found not guilty by reason of insanity under the M'Naghten defense not also fit under the "guilty but mentally ill" definition? ... [T]he point is very simple. Anyone who is found not guilty because of insanity fits under the other definition. The bill is fatally flawed by an attempt to rush it through here, and it should be soundly defeated.

*Id.* at 2131–32, 2132 (Nov. 29, 1982). House Representative Jeffrey E. Piccola of Dauphin County countered his colleague's challenge to the legislation by stating:

> [L]et me address the point raised by Mr. Levin that the definitions are the same. Mr. Levin [in his own discussion of the bill] indicated that they are in fact different. I suggest they are more than just slightly different, that they are significantly different ... [A]n individual who would be found guilty but mentally ill by the definitions found in the bill would have mental conditions less severe than those necessary to be found innocent by reason of insanity. The definitions speak for themselves in that regard.... Those who are less mentally afflicted and attempt to use the insanity defense may attempt to confuse a jury or a finder of fact and convince them that they are innocent by reason of insanity. The finding

permitted under this legislation gives the finder of fact the ability to find such an individual guilty but also provide him with the necessary mental health treatment necessary to treat their illness. The culpability of that individual is spelled out in the definitions found under the bill, and I do not believe it presents any conflict problem that [Representative Levin] is suggesting.

*Id.*

Aside from the parliamentarians' debate over the funding of the Act and disagreement as to the substantive implications of the definition of "insanity" and "guilty but mentally ill," one concept is readily ascertainable from a review of the Act's legislative history: the legislation was clearly promulgated in response to the events surrounding the presidential assassination attempt, and subsequent acquittal, of John W. Hinckley, Jr. Marina Angel, Professor of Criminal Law at Temple University Law School, declared: "It is clear that the wave of public outrage following the Hinckley acquittal by reason of insanity led to [Pennsylvania's guilty but mentally ill] legislation." Angel, *supra*, at 10. In discussions of the bill on the House floor, Minority Whip James J. Manderino conceded that public pressure was a motivating force in fabricating the new law: "[T]he essence of this bill is born out of something that has not occurred in great measure in this Commonwealth but out of something that happened in the assassination attempt on the President. That really is the impetus, I think, for this kind of legislation." Pa. Legislative Journal, House, at 1627–45, 1630 (Sept. 21, 1982). Indeed, the Hinckley acquittal and surrounding debate generated a feeling that the common-law insanity standard was permitting culpable defendants to slip through the cracks of the criminal justice system and escape retribution. Succumbing to this national sentiment, our legislature joined the various other states who had enacted guilty but mentally ill legislation with the hope that the verdict would alleviate the incidence of insani-

ty acquittals.[1] Bolstering this supposition are the comments of Representative Piccola who reiterated:

> The verdict of acquittal in the Hinckley case over the summer raised a defect or deficiency in the law brought to our attention, that being that when the defense of insanity is raised, the burden of proof falls upon the prosecution to prove beyond a reasonable doubt that the defendant was not insane. After review of Pennsylvania law, it appears that we are in the same position as the law in the federal jurisdiction of Washington, D.C. This [bill] will establish by statute that when a criminal defendant raises the insanity defense, the burden would fall upon that defendant to prove by a preponderance of the evidence that he or she is legally insane.

*Id.* at 1627–45, 1632 (Sept. 21, 1982). Continuing his comments in support of passage of the bill, Representative Piccola concluded:

> If you are interested in discouraging the use of the insanity defense and to reform the use of that defense so that the burden of establishing that defense falls upon the defendant, then you will vote for this [bill]. . . . This is the very best that can be done under the circumstances
> . . .

Pa.Legislative Journal, House, at 2131–33, 2132 (Nov. 29, 1982). Regardless of the criticisms that were levied against passage of the bill by a few individuals, Senate Bill 171 passed the House vote easily on September 21, 1982 by a vote of 182 to ten, with four House members abstaining and three members excused. *See id.* at 1627–45, 1644 (Sept. 21, 1982).

Although a review of our General Assembly's debate and discussion of the guilty but mentally ill legislation is helpful for achieving an understanding of its purposes, we must be wary of the manner in which we view the above referenced discussions. Former Chief Justice Warren, in *United*

---

1. Representative Piccola, one of the sponsors of Senate Bill 171, indicated that his research disclosed sixteen insanity acquittals in 1979, seventeen acquittals in 1980, and twenty in 1981. *See Pa. Legislative Journal, House,* at 1627–45, 1642 (Sept. 21, 1982).

*States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), indicated the proper method of ascertaining legislative intent:

When the issue is simply the interpretation of legislation, the court will look to statements by legislators for guidance as to the purpose of the legislation, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading [the legislature's] purpose. It is entirely a different matter when we are asked to void a statute that is ... constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it.... [I]t is unwise to void legislation which [a lawmaking body] had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

391 U.S. at 383–84, 88 S.Ct. at 1682–83. We heed the comments of former Chief Justice Warren and limit our judicial inquiry into the guilty but mentally ill legislation to the facial validity of the statute. *See* Comment, *supra,* at 489.

The legislative history of Senate Bill 171 unearths several basic concepts fundamental to our constitutional analysis of Pennsylvania's guilty but mentally ill verdict. First, we conclude that the guilty but mentally ill verdict is merely the statutory articulation of our legislature's desire to allow the finder of fact to hold responsible those mentally ill defendants who deviate from the laws of this Commonwealth, while at the same time providing them with the humane psychiatric treatment for their mental infirmities. This noble purpose emanated from two unfavorable scenarios. In the first scenario, a mentally ill defendant who is unable to meet the burden of the M'Naghten insanity standard would logically be found either guilty or not guilty. If found guilty, that person could be condemned to serve a period of incarceration for his crime. One does not need to possess a medical degree with a specialty in psychiatry to realize that incarceration of a mentally ill defendant

without structured psychiatric care will likely exacerbate the manifestations of his mental illness. In the second scenario, a mentally ill defendant who commits a violent crime and is adjudged to be insane under the M'Naghten standard could subsequently be released from structured psychiatric treatment into the community. Experience has shown that some chronically mentally ill patients decompensate rapidly without the structured environment, therapy, and medication that they receive in treatment facilities. Consequently, those individuals who are prone to commit violent crimes when their illness intensifies would likely revert to their prior antisocial behavior. Our legislature took these eventualities into consideration when formulating Pennsylvania's guilty but mentally ill statutory scheme and implemented a new verdict which would provide incarceration and treatment of afflicted mentally ill offenders, coupled with the protection of society from dangerously violent persons suffering from the oppression of mental illness.

The second obvious purport of the legislature was to discourage the use of the insanity defense and reform the burdens of proof required of aggrieved defendants. As experience in both Michigan case law and *Hinckley* showed, utilization of the verdict had reached alarming proportions, particularly in light of the prosecution's overwhelming burden of proving the defendant's sanity beyond a reasonable doubt. Consequently, our lawmaking body rationally sought to avert the problems encountered by other jurisdictions under the traditional "guilty," "not guilty," and "not guilty by reason of insanity" verdicts.

Lastly, we observe that our lawmakers promulgated 18 Pa.C.S. § 314 in response to the intense public pressure that surfaced in the wake of *Hinckley*. To the general public, it appeared to be incomprehensible that a man who had carefully planned to fatally injure the President, and had made an attempt to carry through with this contemptuous act, could possibly escape penal retribution for his crime. We surmise that immeasurable public contempt for the manner

in which mentally ill offenders were treated in the criminal justice system was certainly a catalyst for the promotion of the new verdict. Our lawmakers responded to their constituents' grievances by statutorily enacting a verdict which had been time-tested and successful in other American jurisdictions.

As mentioned previously, many of the challenges to the guilty but mentally ill verdict have been grounded in equal protection claims. The most frequent argument used by beleaguered defendants is that guilty but mentally ill statutes create irrational classifications leading to discrimination against defendants found guilty but mentally ill. For example, in *People v. Darwall,* 82 Mich.App. 652, 267 N.W.2d 472 (1978), the accused, Darrel O. Darwall, pleaded insanity but was found guilty but mentally ill of both murder in the second degree and assault with the intent to commit murder. Upon being sentenced to life imprisonment, Darwall challenged Michigan's guilty but mentally ill statutory scheme by claiming that it was discriminatory to subject mentally ill defendants pleading insanity to the risk of guilty but mentally ill verdicts when similar defendants could possibly escape guilty but mentally ill verdicts by merely pleading "not guilty." The Michigan appellate court rejected Darwall's contentions and stated:

> The equal protection clause demands only that the government not impose differences in treatment on persons similarly situated except on the basis of some reasonable differentiation fairly related to the object of the law.... The state's interest in protecting society from insane defendants who exhibit dangerous tendencies and in securing proper treatment for such persons suffering from mental illness certainly bear [sic] a reasonable relation to this statute's provision for two special verdict types indicating the jury's findings as to insanity and mental illness. The law passes muster if its classification is reasonably related to the legislative purpose.

82 Mich.App. at 661, 267 N.W.2d at 476 (citations omitted). Since the Michigan statutory scheme was found to be

reasonably related to its legislative purpose, Darwall's equal protection claim was dismissed as meritless.

In *People v. McLeod*, 407 Mich. 632, 288 N.W.2d 909 (1980), the Michigan Supreme Court was confronted with an equally untenable equal protection attack on Michigan's guilty but mentally ill statute. Here, Joseph McLeod was charged with arson and subsequently interposed a defense of insanity. The trial court found McLeod guilty of arson but mentally ill. McLeod appealed, maintaining that several provisions of the guilty but mentally ill statute infringed upon his fundamental rights and that it could be sustained only if it satisfied a compelling state interest. The court rejected his proposed standard and stated:

> [W]e construe this argument as a challenge to the legislative classification of guilty persons who are mentally ill vis-a-vis guilty persons who are not. The classification of "mentally ill" in this context has none of the indicia of a suspect class. Because neither a suspect class nor a fundamental right is involved in this classification, it will be upheld in the face of an equal protection challenge under both our federal and state constitutions if it rationally furthers the object of the legislation.

407 Mich. at 663, 288 N.W.2d at 919 (footnotes and citations omitted). Further, the court proclaimed:

> [A] guilty but mentally ill defendant has no right to the exercise of unfettered liberty. Such a defendant has been found guilty beyond a reasonable doubt in a judicial proceeding providing the full panoply of rights and protections guaranteed to the criminally accused under both our federal and state constitutions. Such a defendant's liberty may be constitutionally circumscribed by the state.

*Id.* As the Michigan appellate court found in *Darwall*, the legislative purpose in creating the novel guilty but mentally ill verdict rationally furthered the legislative objective of providing supervised mental health treatment and care to guilty but mentally ill defendants. Consequently, the statute passed constitutional muster and the Michigan Supreme Court found no violation of equal protection.

Trill propounds his equal protection challenge by contending that no reasonable basis exists for mandating the incarceration of defendants found guilty but mentally ill whereas defendants found not guilty by reason of insanity are exculpated. Trill contends that it is irrational that a defendant found mentally ill should be held criminally responsible for his acts while a person adjudged "legally insane" is exonerated. This identical issue was raised under Michigan's guilty but mentally ill statute in *People v. Sorna,* 88 Mich.App. 351, 276 N.W.2d 892 (1979). In *Sorna,* the defendant, Jules V. Sorna, was arrested and charged with armed robbery. Sorna defended his criminal charges with a plea of insanity. A jury trial was held wherein he was found "guilty but mentally ill." He appealed, alleging that since the statutory definitions of mental illness and legal insanity are based on substantially similar behavioral characteristics, it is irrational to consider a defendant found mentally ill criminally responsible for his acts while excusing one adjudged legally insane.

Here, the court first reviewed the standard upon which to evaluate the challenged legislation: "Where a state discovers a need to make experimental classifications 'in a practical and troublesome area,' the reviewing court need only 'inquire ... whether the challenged distinction rationally furthers some legitimate, articulated state purpose.'" 88 Mich.App. at 360, 276 N.W.2d at 896 (quoting *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973)). Continuing its analysis, the court reiterated the elements necessary to absolve defendants of liability under Michigan law and deduced as follows:

The legislature, in formulating the [guilty but mentally ill verdict] has established an intermediate category to deal with situations where a defendant's mental illness does not deprive him of substantial capacity sufficient to satisfy the insanity test but does warrant treatment in addition to incarceration. The fact that these distinctions may not appear clear-cut does not warrant a finding of no

rational basis to make them. As the United States Supreme Court has observed:

"[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *United States v. Royster, supra,* 410 U.S. at 270 [93 S.Ct. at 1059].

88 Mich.App. at 360–61, 276 N.W.2d at 896. In so holding, the *Sorna* court concluded that conceptual and definitional differences between the categories of guilty but mentally ill and not guilty by reason of insanity were sufficiently clear to pass the equal protection challenge proffered by the appellant.

■ The equal protection clauses of the fourteenth amendment of the United States Constitution and article I, section 2 of the Pennsylvania Constitution require the state to afford its citizens equal protection of the laws. "The Equal Protection Clause prohibits differences in treatment of similarly situated persons based upon a constitutionally suspect standard (race or religion) or other classifications lacking in rational justification." *Commonwealth v. Stinnett,* 356 Pa.Super. 83, 93, 514 A.2d 154, 159 (1986) (citations omitted). However, the Commonwealth of Pennsylvania is not required to treat all citizens exactly alike. Differential treatment of citizens is permissible where the actions are based on criteria which are reasonably related to the purpose of a legislative enactment and facts exist justifying the disparate treatment. *See In re Estate of Cavill,* 459 Pa. 411, 415, 329 A.2d 503, 505 (1974); *Commonwealth v. Bottchenbaugh,* 306 Pa.Super. 406, 411–12, 452 A.2d 789, 791–92 (1982).

■ In analyzing allegations of equal protection violations, the United States Supreme Court "look[s], in essence, to three things: the character of the classification in question; the individual interest affected by the classification; and the governmental interests asserted in support of the classification." *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1974). Following this analy-

sis, we must first determine the character of the classifications that our legislature has created.

Pennsylvania's guilty but mentally ill statute conceivably creates two classes of individuals: a class of defendants who have committed a crime and are adjudged guilty of the crime but mentally ill, and a class of individuals who have committed a crime but are exculpated as a result of insanity. In the first instance, the legislature has determined that persons classified as guilty but mentally ill either lack the capacity to appreciate the wrongfulness of their conduct or are unable to conform their conduct to the requirements of the law. However, the General Assembly determined that this classification of individuals is capable of possessing the requisite mens rea for the attachment of criminal responsibility. In other words, those individuals who have been found guilty but mentally ill are both "sick" *and* "bad" (i.e., criminally responsible). On the other hand, defendants who have been adjudged insane are defined as laboring under a defect of reason so grave as not to have known the nature and quality of the acts they were doing, or if they did know the nature and quality of the acts, they were unable to comprehend that what they were doing was wrong. In this classification, the legislature found that such individuals were incapable of forming the intent necessary to impose criminal liability. Stated more simply, these individuals are "sick," but not "bad." Given the differing nature of the mental disabilities potentially involved with individuals considered "mentally ill" and one adjudged "legally insane," our lawmakers rationally formed each classification and determined that the former class should be treated and punished for their conduct, and the latter should be treated but not incarcerated. *See* Oler, *Pennsylvania Criminal Law: Defendant's Mental State* § 8.4 "Consequences of guilty but mentally ill verdict or plea" (1986).

Under the second prong of the inquiry articulated in *Dunn,* we are obliged to determine the individual interest affected by the classification in order to ascertain the

proper equal protection standard to apply. In *James v. Southeastern Pa. Trans. Auth.*, 505 Pa. 137, 477 A.2d 1302 (1984), the Pennsylvania Supreme Court summarized the following standards applicable in equal protection cases:

> Under a typical fourteenth amendment analysis of governmental classifications, there are three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. *Singer v. Sheppard,* [464 Pa. 387, 346 A.2d 897 (1975)]. In the second type of cases, [sic] where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Finally, in the third type of case[ ], if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review. *U.S. Dept. of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767, 775 (1973) (concurring opinion of Mr. Justice Marshall), citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). There are, in summary, three standards of review applicable to an equal protection case, and the applicability of one rather than another will depend upon the type of right which is affected by the classification.

505 Pa. at 145, 477 A.2d at 1305–06. We conclude, as did the *Sorna, Darwall,* and *McLeod* courts, that the two legislative classifications created by the guilty but mentally ill verdict implicate neither suspect classes nor fundamental rights. In either classification, the accused has been found to have committed a crime "beyond a reasonable doubt in a judicial proceeding providing the full panoply of rights and protections guaranteed to the criminally accused under both our federal and state constitutions." *McLeod,* 407 Mich. at 662, 288 N.W.2d at 919. Upon this finding, the defendant

loses his right to many of the personal freedoms which he previously enjoyed. Without the presence of either a fundamental right or a suspect class, we conclude that the individual interests involved in the instant appeal warrant the utilization of the "rational basis" test.

Under the rational basis test, in order for 18 Pa.C.S.A. § 314 to pass constitutional muster on equal protection grounds, the classification drawn by the statute "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the legislation so that all persons similarly circumstanced shall be treated alike." *Commonwealth v. Irving*, 347 Pa.Super. 349, 354, 500 A.2d 868, 871 (1985), (citing *Stottlemyer v. Stottlemyer*, 458 Pa. 503, 513, 329 A.2d 892, 897 (1974)). As mentioned earlier in our opinion, the legislative enactment of the guilty but mentally ill verdict was merely the statutory articulation of our legislature's desire to allow the finder of fact to hold responsible those mentally ill defendants who deviate from the laws of this Commonwealth, while at the same time providing them with the humane psychiatric treatment for their mental infirmities. Our legislature perceived a problem with the disposition of mentally ill defendants under the traditional "guilty," "not guilty," and "not guilty by reason of insanity" verdicts. Consequently, they adopted the verdict of guilty but mentally ill with the intention of correcting this shortcoming of the criminal justice system. Concomitantly, they hoped to limit the number of persons, who, in the eyes of the legislature, were improperly being relieved of all criminal responsibility through utilization of the insanity verdict. There is nothing impermissible about such a purpose. It is well within the power of Pennsylvania's lawmaking body to attempt to cure what it perceives to be a defect in the law. We believe that this carefully drafted legislation certainly bears a rational relationship to meeting the goals articulated above. Additionally, the inclusion of treatment provisions for guilty but mentally ill defendants rationally furthers the legitimate, articulated state purpose of providing for the health and welfare of all Pennsylvania citizens,

including those who are adjudicated mentally ill and the public which is indirectly benefitted by having such individuals treated. We commend our lawmakers for their laudable effort to provide treatment for accusees who suffer from the disabling effects of mental illness. As Eli Todd observed as early as the nineteenth century: "Mental disease [is] an illness that stands in the catalogue of human suffering with a sad preeminence of claim over all the others upon our commiseration but which, in truth, has received the smallest share of our assistance." Todd, *Report of the Superintendent, Hartford Retreat for the Insane* 17 (1824).

We also note that a guilty but mentally ill convictee is provided mental health treatment pursuant to 42 Pa.C.S. § 9727(b), and the insanity acquittee is accorded similar treatment pursuant to the Mental Health Procedures Act, 50 P.S. §§ 7101–7503. Thus, both classes of defendants are treated equally under our laws. Inasmuch as both classes of individuals receive mental health treatment geared to their individual needs, the statute cannot be seen as establishing "invidious discrimination" which would be violative of either our state or federal constitutions. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Consequently, we find no merit in Trill's claim that 18 Pa.C.S. § 314 is unconstitutional under either state or federal standards of equal protection. *See* Comment, *Guilty But Mentally Ill: A Verdict of Guilty But Mentally Ill is Constitutional, and the Associated Treatment Provisions Do Not Deprive a Defendant of Equal Protection*, 62 U.Det.L.Rev. 715, 727–28 (1985).

Trill also mounts a constitutional challenge to 18 Pa.C.S.A. § 314 under due process auspices. Here, he argues that the guilty but mentally ill statute is unconstitutionally vague and invites arbitrary convictions, confuses the jury, and leads to improper compromise verdicts. Trill proclaims that by failing to set forth clear guidelines for the courts and juries, the statute denied him due process.

This exact claim was presented to the Michigan Supreme Court in *People v. Ramsey*, 422 Mich. 500, 375 N.W.2d 297 (1985). *Ramsey* was a consolidated appeal from the findings of "guilty but mentally ill" against defendants Bruce Ramsey and Gary Boyd. Ramsey had been charged with first-degree murder for the strangulation and stabbing of his wife. At trial, he raised the defense of insanity, insisting that he believed that he was exorcising a demon from his wife by stabbing her and that she would return to life once the demon was removed. Ramsey was ultimately found guilty of second-degree murder but mentally ill at a bench trial. Boyd had been charged with armed robbery and assault with intent to commit robbery. The events leading to his arrest emanated from an incident at the home of Boyd's former paramour, Ruby Hughes. While visiting, Boyd suddenly, and without provocation, grabbed Ms. Hughes around the neck, held a knife to her throat, and demanded money. He then assaulted several other women in her apartment building and fled. Boyd was found guilty of all counts charged, but mentally ill.

Both individuals maintained that Michigan's guilty but mentally ill verdict denied them due process of the law under state and federal constitutional standards. However, each defendant advanced subtly different averments. Ramsey argued that the danger of jury compromise due to the existence of the guilty but mentally ill verdict caused him to waive his right to a jury trial, amounting to a denial of due process of the law. Boyd contended that submission of the guilty but mentally ill verdict to the jury encouraged a finding of guilty but mentally ill rather than not guilty by reason of insanity and therefore denied him due process.

The Michigan Supreme Court found neither argument persuasive and rejected appellants' constitutional challenge. Addressing appellants' contentions, the court proclaimed: "To a certain extent, we must agree that the inclusion of the [guilty but mentally ill] verdict complicates a trial and creates a greater opportunity for confusion.... But the fact that an extra step is added to the inquiry hardly makes

the inquiry beyond a jury's competence." 422 Mich. at 513, 375 N.W.2d at 301. The court then examined Michigan's definitions of "mental illness" and "insanity" and concluded as follows:

> We conclude that the Legislature has created a clear distinction between mental illness and insanity. Of course, in particular cases, this distinction may be very subtle and difficult for the jury to apply. But, it is no more subtle or difficult than the distinction between the intent to do great bodily harm and the intent to kill, a distinction we allow juries to make which often determines whether a defendant is guilty of first- or second-degree murder. In short, we cannot say that the legislative distinctions between mental illness and insanity deny the right to a fair trial.

422 Mich. at 514, 375 N.W.2d at 302. The court also addressed Ramsey's and Boyd's complaints that the inclusion of the guilty but mentally ill verdict infringed on their rights to a fair trial by creating an unjustifiable risk of a compromise verdict. Here, the court surmised:

> The point ... is not that the possibility of jury compromise requires a conviction to be reversed. That possibility is present in every case. To the contrary, our decisions [in prior cases discussing juror compromise] were based on the reality that compromise does occur, and therefore, the boundaries within which it occurs must be legally and factually supportable.... Since there is no ... error identified in the present cases which, in light of the possibility of compromise, could have prejudiced defendants, we must reject their claims.... To hold otherwise would require us to presume a jury compromise in every case where more than one verdict or charge is submitted to the jury.

422 Mich. at 515–16, 375 N.W.2d at 303 (footnote omitted). Thus, the Michigan Supreme Court refused to strike down as unconstitutional the verdict that had withstood ten years of judicial scrutiny in the Michigan courts.

In *People v. DeWit*, 123 Ill.App.3d 723, 79 Ill.Dec. 188, 463 N.E.2d 742 (1984), an Illinois appellate court was confronted with the same constitutional challenge that was involved in *Ramsey*. The appellant, Paul DeWit, was found guilty but mentally ill of murder. Upon being sentenced to serve a twenty-two-year sentence, he appealed asserting the unconstitutionality of Illinois's guilty but mentally ill verdict. Like the appellants in *Ramsey* and Trill in the instant case, DeWit contended that the guilty but mentally ill verdict promoted jury confusion and encouraged the finding of guilty but mentally ill as a compromise verdict. Responding to appellant's assertions, the court first established the standard by which to analyze DeWit's claim:

> It is well established that to survive a challenge of denial of due process a statute may not be so vague that men of common intelligence must necessarily guess at its meaning.... A statute must also provide sufficiently definite standards for law enforcement officials and triers of fact so that its application does not depend merely on their private conceptions.

123 Ill.App.3d at 735–36, 463 N.E.2d at 750 (citations omitted). Examination of the Illinois statute by the court revealed that its requirements were set forth in clear and simple language. Since the statute actually had the effect of clarifying the distinction between the verdicts of not guilty by reason of insanity and guilty but mentally ill, the court found the definitions provided sufficiently meaningful standards for the jury to make the required findings, and thus did not constitute a violation of DeWit's constitutionally guaranteed right of due process. Further, addressing DeWit's contention that the verdict was unconstitutional because it provides a "compromise" or "middle ground" for juries to accept, the court stated as follows: "We are not persuaded that the possibility of a compromise verdict is a constitutional infirmity where the jury still must make a determination in the first instance between whether a defendant is guilty or legally insane based upon the evidence at trial." *Id.* Consequently, DeWit's challenge to the

constitutionality of the guilty but mentally ill verdict utilizing these arguments failed.

■■■ In considering Trill's due process challenge to 18 Pa.C.S. § 314, we must bear in mind the principles supporting the guarantee of due process of the law. In *Commonwealth v. Burt*, 490 Pa. 173, 415 A.2d 89 (1980), our supreme court stated: "It is a fundamental principle of due process that a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or is so indefinite that it encourages arbitrary and erratic arrests and convictions, is void for vagueness." 490 Pa. at 177, 415 A.2d at 91 (quotations and citations omitted); *see also Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985). Indeed, the measuring stick by which the courts determine whether a statute is so vague as to offend due process was set forth by the Supreme Court in *Papachristou v. Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1971). Justice Douglas indicated that a statute will be struck down as void for vagueness where it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." 405 U.S. at 162, 92 S.Ct. at 843. The Supreme Court explained the rationales underlying the vagueness principle in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) wherein the Court stated:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to

policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the the forbidden areas were clearly marked."

408 U.S. at 108–09, 92 S.Ct. at 2298–99 (footnotes omitted). At the same time, however, "The fact that [the legislature] might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 90, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975); *see also Commonwealth v. Burt*, 490 Pa. 173, 177–78, 415 A.2d 89, 92 (1980). We begin our analysis of Trill's due process claim by first looking to the express language of the statute. Trill directs our attention to two aspects of the statutory language which are allegedly unclear and vague. First, he maintains that section 314 is deficient in that it fails to articulate the appropriate burden of proof to be assessed when the verdict is utilized. Essentially, he contends that it is unclear whether the standard of proof beyond a reasonable doubt applies only to the part of the statute relating to guilt, or if it also applies to all elements of the crime. We are unable to agree that the language regarding the burden of proof is so ambiguous or confusing as to deny Trill due process. Section 314 of the Crimes Code provides:

(a) General rule.—A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, *beyond a reasonable doubt*, that the person is *guilty of an offense*, was *mentally ill* at the time of the commission of the offense and was *not legally insane* at the time of the commission of the offense.

18 Pa.C.S. § 314(a) (emphasis added). Section 315, dealing with the insanity defense, provides:

(a) General Rule.—The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when *the actor proves by a preponderance of evidence* that the actor was legally insane at the time of the commission of the offense.

*Id.* § 315(a) (emphasis added). Under a plain reading of the guilty but mentally ill statutory scheme, we think it is abundantly clear that its language adequately guides the fact finder in the appropriate examination for the finding of guilty but mentally ill.

■■■ Several steps of inquiry logically follow from the legislature's express language. First, the fact finder is called upon to determine if the Commonwealth has proven that the actor is guilty of every element of the offense charged beyond a reasonable doubt. The Commonwealth needed to prove that Trill was guilty beyond a reasonable doubt of each element of robbery, simple assault, and terroristic threats. If the Commonwealth fulfills its burden of proof, which it did in this instance, the fact finder then moves to the second step of the probe.

The second step calls for a determination of whether the accused has proven the defense of insanity by a preponderance of the evidence. If he was able to succeed in proving by a preponderance of evidence that he was insane at the time of the commission of the offense, then he must be acquitted. However, if the accused was unable to fulfill his burden of proving insanity, which the jury determined to be the case here, then the fact finder moves to the third level of scrutiny.

The third level of examination calls for the fact finder to ascertain whether the facts establish beyond a reasonable doubt that the accused was mentally ill. If the fact finder establishes that the accused meets the statutory definition, the verdict must be guilty but mentally ill. In the case at bar, the Delaware County jury panel found that Trill did in

fact possess a mental disease or defect and lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Consequently, the jury rendered a verdict of guilty but mentally ill. If it had found that the evidence did not support the finding of mental illness, then the verdict would have been merely guilty.

We believe that the statutory scheme enacted by the legislature provides ample notice to persons of ordinary intelligence of the potential verdict of guilty but mentally ill, and of the burdens of proof associated with the verdict. Consequently, we reject Trill's contention that the language of the statute is unclear and vague. Additionally, we note that if confusion existed among the jurors concerning the burdens of proof attached to the verdict of guilty but mentally ill, it was dispelled by Judge Semeraro's aptly articulated jury charge.

 The second aspect of 18 Pa.C.S. § 314 which Trill challenges as being unclear and vague is the statutory definitions of "mentally ill" and "legal insanity." Trill asserts that the definitions promote a distinction without a substantive difference in meaning. As a result, he believes that the confoundment generated by the allegedly confusing and vague definitions makes it likely that a jury would pick the compromise verdict of guilty but mentally ill. We cannot agree.

Our General Assembly provided the following two definitions for purposes of implementing the guilty but mentally ill verdict:

(1) "Mentally ill." One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

(2) "Legal insanity." At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did

know it, that he did not know he was doing what was wrong.

18 Pa.C.S. § 314(c)(1)(2). We agree with Trill that the application of these definitional standards to a particular defendant may be difficult. *See* Comment, *The Guilty But Mentally Ill Verdict and Due Process,* 92 Yale L.J. 475, 489 (1983). Indeed, the concepts of mental illness and insanity are closely interwoven. One commentator has noted:

> Mental illness and insanity are qualitatively separate concepts. The two definitions do, however, overlap. All individuals who are legally insane are also mentally ill. But the converse of the statement, that all persons who are mentally ill are also insane, is false. The difference is not quantitative. In other words, an extremely mentally ill individual may not be legally insane. A high degree of mental illness does not destroy mens rea. The difference is qualitative. Insanity definitions are attempts to isolate the element of mens rea that may be present in some illnesses but not in others. Because the two concepts involve qualitatively separate elements, they are not likely to cause undue confusion to juries.

*See* Comment, *Guilty But Mentally Ill: An Historical and Constitutional Analysis,* 53 J.Urban L. 471, 488 (1976). However, the inherent difficulty in distinguishing between the two verdicts does not *ipso facto* render the definitions and subsequent verdicts invalid. In this instance the legislature has chosen to institute definitional standards for conduct that even the most learned experts in psychiatry are unable to agree upon: the requisite amount of mental impairment needed to impose criminal liability. Dr. Lawrence Kolb, a noted psychiatrist, has stated:

> The concepts of mind held by psychiatry and by the law are so disparate that it is difficult for the two professions to agree as to responsibility for behavior, especially criminal behavior. According to the concept held by law, the mind is dominated by reason and full will, and behavior results from a consciously determined intent. The law

does recognize partial responsibility, although to the psychiatrist responsibility does not have definable boundaries and degrees. Law confines its exploration of behavior to conscious data and assumes that a disorder of the cognitive faculty (knowledge) is the only basis for the determination of responsibility for behavior termed criminal. Psychiatry, on the other hand, assumes that mental processes are controlled by both conscious and unconscious factors, the latter playing a very important part; that behavior is an expression of the personality as a whole as determined by a multiplicity of complex factors, including the unconscious effect of early experiences, later pressures, and emotional needs.

Kolb, *Modern Clinical Psychiatry* 664 (1973). As we recently stated in *Commonwealth v. Cain*, 349 Pa.Super. 500, 503 A.2d 959 (1986):

[T]he possible shades of difference between theoretical mental perfection and theoretical total absence of mind are not two or five or a dozen—but infinity. At what point in this unperceptible shading from one extreme to the other does the dividing line between sanity and insanity appear? As ably said in a case involving testamentary capacity:

There is no difficulty in the case of a raving madman or of a drivelling idiot, in saying that he is not a person capable of disposing of his property. But between such an extreme case and that of a man of perfectly sound and vigorous understanding, there is every shade of intellect, every degree of mental capacity. There is no possibility of mistaking midnight for noon; but at what precise moment twilight becomes darkness is hard to determine.

349 Pa.Super. at 516, 503 A.2d at 967 (citations omitted). A great deal of progress has been made in the understanding of human mental processes in the last decade. However, regardless of the painstaking efforts to analyze and comprehend mental illness, the medical community remains unable to pinpoint the cognitive impulses that control aber-

rant behavior. Dr. Sigmund Freud envisioned the inevitable struggle that all disciplines would encounter in attempting to reduce the study of the mind to a science. He stated: "We must recollect that all our provisional ideas in psychology will [hopefully] some day be based on an organic substructure. This makes it probable that special substances and special chemical processes could [someday] control the operation [of the brain]." Jones, *The Life and Work of Sigmund Freud* 173 (1961). To date, medical science has been unsuccessful in reducing all of the causes and symptoms of mental illness to an exact science. Consequently, much of what is written and prescribed for mentally disturbed individuals is subject to argument and debate. Such is the case when a lawmaking body attempts to define terms such as mental illness and insanity.

Our legislature settled upon what they believed to be the most comprehensive legal definitions available to describe the terms "mentally ill" and "legal insanity" and incorporated them into Pennsylvania's guilty but mentally ill statutory scheme. The definition of "legal insanity" derived from the well-engrained common-law M'Naghten standard for insanity, whereas the definition of "mentally ill" emanated from the American Law Institute's insanity standard. *See* ALI Model Penal Code § 4.01(1) (Proposed Official Draft 1962). By transposing the ALI definition into one for mental illness, the legislature accomplished what they believed to be a logical corollary to the M'Naghten rule. We will not second guess the rectitude of this choice. Through the study of the Michigan statutory scheme and subsequent developments in the guilty but mentally ill verdict, our lawmaking body arrived upon a set of definitions that they hoped would reduce the determination of a defendant's mental state to a workable formula. *See* Comment, *Guilty But Mentally Ill, A Reasonable Compromise for Pennsylvania*, 85 Dick.L.Rev. 289, 311–12 (1981). In essence, they utilized what their research and experience proved to be the "state of the art" in definitive language. Although we believe that it is virtually impossible to fabricate exact definitions for such amorphous concepts as "mental illness"

and "legal insanity," we nonetheless conclude that our legislature has succeeded in implementing definitions which provide sufficient clarity and distinction to provide guidance for the fact finder. As Representative Piccola stated in the legislative discussions of the new statutory scheme, "This is the very best that can be done under the circumstances." Pa.Legislative Journal, House, at 2131–33, 2132 (Nov. 29, 1982). Consequently, we are unable to find that the definitions of "mental illness" and "legal insanity" are so vague and confusing that they rise to the level of violating Trill's constitutionally guaranteed right of due process.

■ Finally, Trill asserts that the existence of the guilty but mentally ill verdict improperly promotes jury compromise. Generally, the law does not approve or contemplate compromise verdicts. Juries are generally expected to reach verdicts without compromise, and when such compromise does occur, the result should be invalidated. 23A C.J.S. Juries, Compromise Verdicts § 1374 (1974). A compromise verdict occurs when several members of a jury panel abandon their beliefs to settle upon a common ground with their fellow jurors. This scenario may occur in the interest of agreement among all panel members. When such a compromise does occur, the defendant has not been found guilty beyond a reasonable doubt by all members of the jury, and he has been denied due process of the law. There is no constitutional infirmity, however, when jurors change their mind during deliberations. Indeed, one of the most celebrated works in American cinematography involves a scenario in which one juror convinces eleven other individuals to accede to his position. *See Twelve Angry Men* (Sergel, Sherman L., Director, Dramatic Publishing Co. 1955).

Trill does not articulate exactly how the guilty but mentally ill verdict led to a compromise in his criminal conviction. We surmise that Trill is suggesting that given the choice between the verdicts of not guilty by reason of insanity and guilty but mentally ill, the jurors chose the latter because of the alleged similarity and confusion be-

tween the two verdicts. We find this supposition to be entirely too speculative, and that it presupposes that jury compromise occurs in every case where more than one verdict or charge is submitted to the jury. If Trill believed that the jury improperly arrived at a compromise verdict, he was free to poll the jurors. Absent any specific facts supporting this contention, we cannot find that Trill was denied due process.

For the forgoing reasons, we conclude that Trill has failed to overcome the strong presumption of constitutionality which attaches to acts of the General Assembly. In his challenge to the guilty but mentally ill statutory scheme, Trill was unable to demonstrate that 18 Pa.C.S. § 314 clearly, palpably, and plainly violates either our state or federal constitution. Accordingly, we affirm the judgment of sentence entered by the trial court.

Judgment affirmed.

BECK, J., files a concurring opinion.

BECK, Judge, concurring:

I join in the majority's discussion and resolution of Trill's first six challenges to his sentence. I also agree with the majority that Pennsylvania's guilty but mentally ill statute, 18 Pa.Cons.Stat.Ann. § 314 (Purdon 1987) is constitutional. However, I disagree with the majority's analysis of the constitutionality of that statute.

Trill first claims that his due process rights were violated because the definitions of "mentally ill" and "legally insane" overlap. He asserts that the defendant who falls within the definitional overlap is exposed to the risk that the jury will arbitrarily categorize him as "mentally ill" rather than "legally insane." The consequences of such a categorization are significant. If a defendant is found to be guilty but mentally ill, he is subject to the full range of criminal penalties applicable to someone found simply guilty. The legally insane defendant, on the other hand, is immune from the punishments of the criminal law, and will

be released from state custody unless he is determined to be currently dangerous to himself or to others.[1]

Trill claims that the definitions of "mentally ill" and "legally insane" overlap in the case of the defendant whose mental problems prevent him from comprehending the wrongfulness of his conduct. "Mentally ill" for purposes of application of the guilty but mentally ill verdict is defined as follows:

"Mentally ill." One who as a result of mental disease or defect, lacks *substantial capacity* either *to appreciate the wrongfulness of his conduct* or to conform his conduct to the requirements of the law. (emphasis added)

18 Pa.Cons.Stat.Ann. § 314(c)(1) (Purdon 1983).

Legal insanity constituting a defense to a crime is defined as follows:

[T]he phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that *he did not know that what he was doing was wrong.* (emphasis added)

18 Pa.Cons.Stat.Ann. § 315(b) (Purdon 1983). Trill argues that there is no meaningful difference between "one who .. lacks substantial capacity ... to appreciate the wrongfulness of his conduct" (mentally ill) and "[one who] did not know that what he was doing was wrong" (legally insane). Therefore, he claims, the jury could not make a reasoned distinction between the two categories, and their finding that the defendant was "guilty but mentally ill" instead of "legally insane" was merely arbitrary.

1. An insanity acquitee can be involuntarily committed to a mental institution on the grounds that he poses a "clear and present danger of harm to others or to himself," 50 Pa.Cons.Stat.Ann. § 7301(a) (Purdon Supp.1987), or that "(1) the conduct that led to the criminal proceedings occurred; and (2) that there is a reasonable probability that it will occur again." *Commonwealth v. Helms,* 352 Pa.Super. 65, 73, 506 A.2d 1384, 1388 (1986).

I agree that the statutory definitions of "mentally ill" and "legally insane" are somewhat similar. Both include a person whose understanding of the wrongfulness of his conduct is impaired. Closer examination, however, yields the conclusion that the two definitions refer to differing degrees of impaired understanding. They are therefore sufficiently different to withstand attack on the ground that the jury cannot make a principled application of the statutory definitions.

"Mentally ill" and "legally insane," while both referring to conditions of mental disturbance, describe two distinct points along the continuum of mental conditions. The difference between the two conditions is aptly explained in the suggested standard jury instructions on the guilty but mentally ill verdict, which have been approved by this court:

> [The] definitions [of mentally ill and legally insane] differ ... with regard to the incapacitating effect necessary for legal insanity on the one hand or mental illness on the other. Legal insanity requires that the defendant be *incapable* either of knowing what judging its wrongfulness. Mental illness requires only that the defendant lack *capacity* either to appreciate the what he is doing or to obey the law. Loosely speaking, mental illness is the broader term. It covers a greater range of abnormal conditions than legal insanity.[2]

*Commonwealth v. Cain*, 349 Pa.Super. 500, 517–18, 503 A.2d 959, 967 (1986) (emphasis in original).

The difference between mental illness and legal insanity with regard to comprehension of the wrongfulness of one's conduct is a matter of the *degree* of one's impairment. The mentally ill defendant in a murder case may exhibit only a limited understanding that killing is generally agreed to be wrong; the legally insane person has no idea whatsoever that killing is considered to be wrong. I find this distinction to be sufficient to permit a jury to differentiate between mental illness and legal insanity, and therefore would up-

---

**2.** These instructions were in fact given in the case sub judice.

hold the constitutionality of the guilty but mentally ill verdict.

Trill claims a second due process infirmity. He asserts that by allowing the judge to instruct the jury on the possible verdict of guilty but mentally ill when a defendant raises the legal insanity defense violates due process. Trill contends that the statute, by its operation, forces a defendant to raise a defense (mental illnesses)[3] which he or she does not wish to raise and undercuts the defendant's ability to present a successful legal insanity defense. Trill asserts that the addition of the instruction on the guilty but mentally ill verdict to the legal insanity instruction gives the jury a chance to return a compromise verdict. The statute does not improperly give to the jury an opportunity to return a irrational or arbitrary compromise verdict, as Trill suggests. Here, the jury must make an initial determination of guilt, or innocence, or insanity based upon the evidence at trial before considering whether to return a guilty but mentally ill verdict. Thus, there is no danger that the jury would be confounded by an irrelevant instruction which would lead to an irrational conviction not based on the evidence. *See Commonwealth v. Williams*, 490 Pa. 187, 191, 415 A.2d 403, 404 (1980).

The appellant makes a due process attack in that a defendant may be forced by the operation of the statute to plead guilty but mentally ill as a consequence of his pleading not guilty by reason of legal insanity when his intention was to limit his plea to not guilty by reason of insanity. The appellant asserts the defendant is forced to undermine his own insanity defense. I disagree.

In the first place, it must be noted that in a plea of not guilty by reason by insanity the defendant acknowledges

**3.** It is not correct to refer to the statutory provision of guilty but mentally ill as a defense. An analysis of the statute leads to the conclusion that defendants pleading under it are pleading guilty but notifying the Commonwealth that they are mentally ill and therefore in need of treatment. If the defendant is found guilty but mentally ill, the Commonwealth must make provision for treatment in sentencing the defendant.

guilt. With the defendant's guilt acknowledged a jury has three options where a defendant has pled legal insanity. It can find the defendant legally insane, it can find him guilty but mentally ill or it can find him simply guilty. If the jury rejects the plea of legal insanity, the jury is then given the opportunity to determine more precisely the nature of the defendant's guilt i.e. guilty but mentally or simply guilty. It is much the same as in the usual criminal case where a jury rejects defendant's plea of not guilty, it finds the defendant guilty. In a situation where the jury rejects the not guilty by reason of insanity, it finds the defendant simply guilty or under this special circumstance it can find the defendant guilty but mentally ill. I see no due process infirmity in giving the jury this latitude.

However, where the defendant pleads legal insanity due process considerations as well as the statutory scheme require that the jury be instructed on the step by step analysis by which they must proceed. First the jury must be instructed to determine if the defendant has proven by the preponderance of the evidence that he is legally insane. If the defendant is successful in so proving, the matter is ended because the defendant has successfully asserted the "not guilty by reason of insanity defense."

If the defendant fails to prove that he or she is legally insane, it is only then that the jury considers whether the defendant is guilty but mentally ill or simply guilty.

It is important to note that in considering whether to find the defendant guilty but mentally ill or simply guilty, the jury is considering types of guilt, not the questions of innocence or valid defenses. At this point, the label "but mentally ill" may be attached for sentencing, not guilt determination, purposes. Therefore, the defendant is not at all forced to undermine his own insanity defense.

Finally, Trill claims that the statute is unconstitutionally vague in that it fails to articulate the appropriate standard to be applied under the guilty but mentally ill statute. A plain reading of the statute demonstrates that three ele-

ments must be proven *beyond a reasonable doubt:* 1) that the defendant is guilty; 2) that the defendant was mentally ill at the commission of the offense; and, 3) that the defendant was not legally insane at the commission of the offense. The statute is not vague but highly specific. All three elements must be proven by the Commonwealth beyond a reasonable doubt. As to element of guilt, the defendant acknowledges his guilt in the plea of legal insanity. No further burden is placed on the Commonwealth. As to the third element; i.e. legal insanity, I conclude the majority correctly interprets the requirement. The question of legal insanity is resolved at the point when the jury finds that the defendant failed to prove legal insanity. At that juncture, the fact is conclusively established that the defendant is not legally insane.

Lastly, the Commonwealth must prove that the defendant is mentally ill beyond a reasonable doubt. This requirement, while constitutionally firm, presents a practical problem in its operation. The defendant's guilt has already been established. Therefore, the Commonwealth, would have little, if any, incentive to prove that the defendant was mentally ill at the time of the crime. Thus, this requirement undermines the statute by rendering rare its actual use.

Furthermore, I believe that the beyond a reasonable doubt requirement is ill-advised for another reason. As a matter of public policy, the standard should be set lower to ensure that defendants requiring treatment for mental illness while serving a sentence receive treatment. It must be borne in mind that guilty but mentally ill does not necessarily entitle a defendant to a more lenient sentence than a defendant who is simply guilty. The sentence stemming from the guilty but mentally ill verdict is a signal that the defendant must be afforded treatment. Proof of mental illness *beyond a reasonable doubt* is too strict a standard to impose as a condition of the defendant's receiving treatment.